# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# FT. MYERS DIVISION

**NILDA CARDONA,**

**Plaintiff,**

**-vs-**                                                    Case No.  **2:13-cv-32-FtM-29DNF**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security[1],**

**Defendant.**

_____

## REPORT AND RECOMMENDATION

## TO THE UNITED STATES DISTRICT COURT

Plaintiff, Nilda Cardona, seeks judicial review of the final decision of the Commissioner of the Social Security Administration denying her claim for Disability and Disability Insurance Benefits[2]. The Commissioner filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties filed legal memoranda in support of their positions.  For the reasons set out herein, it is respectfully recommended that the decision of the Commissioner be **AFFIRMED**, pursuant to § 205(g) of the Social Security Act, 42 U.S.C § 405(g).

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.  Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted, therefore, for Commissioner Michael J. Astrue as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Because the disability definitions for DIB and SSI are identical, cases under one statute are persuasive as to the other.  *Patterson v. Bowen*, 799 F.2d 1455, 1456 n.1 (11th Cir. 1986); *McCruter v. Bowen*, 791 F.2d 1544, 1545 n.2 (11th Cir. 1986).

## I.      Social Security Act Eligibility, Procedural History, and Standard of Review

The law defines disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d) (2); 20 C.F.R. §§ 404.1505-404.1511.

### A.      Procedural History

On January 29, 2010, Plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging a disability onset date of April 1, 2005. (Tr. 14, 89). Plaintiff's last date insured was December 31, 2008. (Tr. 16).  Plaintiff's request for benefits was denied initially on March 26, 2010, and upon reconsideration on July 2, 2010. (Tr. 55, 62). Plaintiff filed a written request for a hearing on July 20, 2010 (Tr. 64), and an administrative hearing was held before Administrative Law Judge Frederick McGrath ("ALJ") on August 10, 2011. (Tr. 11).  Plaintiff testified at the hearing, but no vocational expert or other experts appeared at the hearing. (Tr. 29).  On August 10, 2011, the ALJ rendered his decision, in which he determined that Plaintiff was not under a disability, as defined in the Social Security Act, at any time from April 1, 2005, the alleged onset date, through December 31, 2008, the date last insured. (Tr. 24).  Plaintiff's request for review was denied by Appeals Council on November 11, 2012. (Tr. 1-3).

### B.        Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate support to a conclusion.  Even if the evidence preponderated against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford v. Comm'r.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997)); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). In conducting this review, this Court may not reweigh the evidence or substitute its judgment for that of the ALJ, but must consider the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Martin v. Sullivan*, 894 F.2d 1329, 1330 (11th Cir. 2002); *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). However, the District Court will reverse the Commissioner's decision on plenary review if the decision applied incorrect law, or if the decision fails to provide sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Dep't. of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  The Court reviews de novo the conclusions of law made by the Commissioner of Social Security in a disability benefits case. Social Security Act, § 205(g), 42 U.S.C.A. § 405(g).

The ALJ must follow five steps in evaluating a claim of disability. 20 C.F.R. §§ 404.1520, 416.920.  At step one, the claimant must prove that he is not undertaking substantial gainful empoyment. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001), *see* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is engaging in any substantial gainful activity, he will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(I).

At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(ii). If the claimant's impairment or combination of impairments does not significantly limit his physical or mental ability to do basic work activities, the ALJ will find that the impairment is not severe, and the claimant will be found not disabled. 20 C.F.R. § 1520(c).

At step three, the claimant must prove that his impairment meets or equals one of impairments listed in 20 C.F.R. Pt. 404, Sbpt. P. App. 1. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(iii). If he meets this burden, he will be considered disabled without consideration of age, education and work experience. *Doughty*, 245 F.3d at 1278.

At step four, if the claimant cannot prove that his impairment meets or equals one of the impairments listed in Appendix 1, he must prove that his impairment prevents him from performing his past relevant work. *Id.* At this step, the ALJ will consider the claimant's RFC and compare it with the physical and mental demands of his past relevant work. 20 C.F.R. § 1520(a)(4)(iv), 20 C.F.R. § 1520(f) . If the claimant can still perform his past relevant work, then he will not be found disabled. *Id.*

At step five, the burden shifts to the Commissioner to prove that the claimant is capable of performing other work available in the national economy, considering the claimant's RFC, age, education, and past work experience. *Doughty*, 245 F.3d at 1278, 20 C.F.R. § 1520(a)(4)(v). If the claimant is capable of performing other work, he will be found not disabled. *Id.* In determining whether the Commissioner has met this burden, the ALJ must develop a full and fair record regarding the vocational opportunities available to the claimant. *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). There are two ways in which the ALJ may make this determination. The first is by applying the Medical Vocational Guidelines ("grids"), and the

second is by the use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239 (11th Cir. 2004).  Only after the Commissioner meets this burden does the burden shift back to Claimant to show that he is not capable of performing the "other work" as set forth by the Commissioner. *Doughty v. Apfel*, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

## II.     Review of Facts

### A.  Background Facts

Plaintiff was born on May 18, 1954, and was 54 years of age on her date last insured. (Tr. 22).  Plaintiff has at least a high school education and is able to communicate in English. (Tr. 22).  Plaintiff has the following severe impairments: history of pulmonary embolism, status post removal of right atrial mass, and panic attacks. (Tr. 16).

### B.  The ALJ's Findings

At the first step, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008, and had not engaged in substantial gainful activity during the period from her alleged onset date of April 1, 2005, through her date last insured of December 31, 2008.  (Tr. 16).

At the second step, the ALJ determined that Plaintiff suffered from the following severe impairments: (1) history of pulmonary embolism, (2) status post removal of right atrial mass, and (3) panic attacks. (Tr. 16).  The ALJ found that the foregoing impairments impose more than minimal functional limitations on work-related activity. (Tr. 16).

At the third step, the ALJ found that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § Part 404, Subpart P, Appendix 1. (Tr. 16).

At the fourth step, the ALJ found that Plaintiff, through the date last insured,

> had the residual functional capacity to perform a wide range of light work as
> follows:  the claimant could lift and carry, and push and pull, up to 20 pounds
> occasionally and 10 pounds frequently.  She could sit for 6 hours, and stand/walk
> for 6 hours, over an 8-hour workday.  The claimant had no postural, manipulative,
> environmental, visual or communicative limitations.  The claimant retained the
> capacity to understand, remember and carry out simple and some detailed
> instructions, to make judgments on simple work-related matters, to interact
> appropriately with the public, co-workers and supervisors, and to adapt to changes
> in a workplace setting.  The claimant was precluded from understanding,
> remembering and carrying out complex job instructions.

(Tr. 17-18).  The ALJ concluded that Plaintiff was capable of performing past relevant work as a

sales associate/stocker and that this work did not require the performance of work-related

activities precluded by Plaintiff's residual functional capacity. (Tr. 22).

Despite his finding at the fourth step that Plaintiff was capable of performing past

relevant work, the ALJ proceeded to step five.  The ALJ considered Plaintiff's age, education

and work experience and determined that Plaintiff could perform "other work" existing in

significant numbers in the national economy, on and prior to the date last insured. (Tr. 23).

**B. Medical Record Evidence**

On April 22, 2005, Plaintiff visited Madhava T. Pally, M.D., F.A.C.C., F.C.C.M., for a

cardiologoy consultation. (Tr. 234).  Dr. Pally noted that Plaintiff was a 50-year-old woman who

had been experiencing palpitations described as fast heart beating that lasted about an hour each

time for the last three to four weeks. (Tr. 234).  Dr. Pally noted that Plaintiff reported feeling

dizzy and diaphoretic when these spells happen and that she had severe fatigue. (Tr. 234).  Dr.

Pally made the following impression: 1) that Plaintiff had palpitation described as rapid heart

beating associated with dizziness and diaphoresis following recent viral illness, 2) severe fatigue

secondary to recent viral illness; 3) pain in between scapulae; 4) history of breast surgery for

benign condition; and 5) status post cholecystectomy from six years ago. (Tr. 235).  Dr. Pally

recommended that Plaintiff have an echocardiogram performed to rule out pericardial disease. (Tr. 235).

On April 25, 2005, Dr. Pally completed an Exercise Tolerance Test Report of Plaintiff. (Tr. 263).  Dr. Pally noted that Plaintiff was a 50-year-old female with palpitations and suspicious angina pectoris because of pain in between scapulae. (Tr. 263).  Plaintiff's resting EKG showed normal sinus rhythm with frequent ventricular premature beats. (Tr. 263).  Dr. Pally noted that Plaintiff exercised on a standard Bruce protocol to the heart rate of 141 bpm, which was 88% of age predicted maximum heart rate, and the total time of exercise was 4 minutes and 22 seconds terminating because of fatigue and the total METS achieved was 6.9 and maximum VO2 was 24.3. (Tr. 263).  Plaintiff did not suffer any angina and the ventricular premature beats disappeared during stress. (Tr. 263).  Dr. Pally recorded the following impression: 1) Baseline abnormal EKG with left ventricular premature beats, disappeared during the stress, suggesting benign nature of the ventricular premature beats; 2) Normal myocardial perfusion scan with no evidence of myocardial ischemia; and 3) normal gated study with normal wall motion and thickening with the EF of 70%.

On April 26, 2005, Dr. Pally completed a 2-D Echocardiographic Report of Plaintiff. (Tr. 254).  Dr. Pally recorded the following impression: 1) Right atrial mass, rule out thrombus and myxoma; 2) normal left ventricular systolic function; 3) pericardial effusion, small. (Tr. 254).

On July 11, 2005, Plaintiff presented to Dr. Pally with fatigue, which had started two days before the visit. (Tr. 231).  Dr. Pally noted that Plaintiff had seen a hematologist recently and was told to continue Coumadin for the rest of her life. (Tr. 231).  Dr. Pally further noted that Plaintiff had a clot in her right atrium removed by open-heart surgery by Dr. Vasu in Port

Charlotte a few months earlier.[3]  A physical examination of Plaintiff revealed that her skin was warm and dry, that her jugular venous pressure was normal, that her chest was clear and that her heart examination revealed normal S1 and S2. (Tr. 231).  An EKG revealed normal sinus rhythm at a rate of 83 beats/minute with T wave inversion in V1 and V2. (Tr. 231).  Dr. Pally recorded the following impressions: 1) Rule out left lower extremity DVT; 2) hypercoagulable state; 3) history of right atrial mass, which was thrombus removed by open-heart surgery; and 5) normal TSH level as per patient. (Tr. 232).

On March 6, 2006, Plaintiff visited Dr. Pally complaining of left leg cramping and numbness. (Tr. 228).  Dr. Pally noted that Plaintiff sits for prolonged periods of time, but that there was no swelling of the feet or bluish discoloration of the toes. (Tr. 228).  Plaintiff had no chest pain or dyspnea. (Tr. 228).  A physical examination of Plaintiff revealed that her blood pressure was 180/75 mm Hg, that she was five feet tall and weighed 102 pounds.  Plaintiff's heart examination was with normal S1, S2, no murmurs, rubs, or gallops. (Tr. 228).  In particular, on the examination of the left lower extremity, no muscle wasting, no decreased of sensation. (Tr. 228).  Dr. Pally directed Plaintiff to continue taking Coumadin for one more month and to have an MRI of her lumbosacral spine. (Tr. 228).

On September 1, 2006, Plaintiff visited Dr. Pally. (Tr. 227).  Dr. Pally noted that Plaintiff had no chest pain or dyspnea. (Tr. 227).  Dr. Pally recommended that Plaintiff undergo an echocardiogram due to her abnormal EKG, exercise tolerance test, and to see if there was any recurrence of clots in her right arm. (Tr. 227).

On September 19, 2006, Dr. Pally completed an Exercise Tolerance Test Report of Plaintiff. (Tr. 261).  Dr. Pally noted that Plaintiff indicated that she was having chest pain. (Tr.

---

[3] The only medical records pertaining to this surgery is a Surgical Pathology Report which provides that Plaintiff was diagnosed with a pulmonary artery clot with thromboembolic material after microscopic examination on April 28, 2005. (Tr. 372).

261).  Plaintiff was exercised on a standard Bruce protocol to the heart rate of 158 bpm, which is

100% of age-predicated maximum heart rate, and the total time of exercise was 7 minutes 49

seconds achieving 9.7 METS of work and maximum VO2 of 34. (Tr. 261).  Plaintiff experienced

no angina and Plaintiff's stress EKG showed no significant ST segment changes ischemia. (Tr.

261).  Dr. Pally recorded the following impression: 1) Functional class I with achievement of

submaximal heart rate with no significant electrocadiographic or symptomatic evidence of

myocardial ischemia; 2) Normal myocardial perfusion scan with no evidence of myocardial

ischemia; 3) Normal gated study with normal wall motion and thickening EF of 70%. (Tr. 261).

On September 16, 2006, Dr. Pally completed a 2-D Echocardiographic Report of

Plaintiff. (Tr. 253).  Dr. Pally recorded the following impression: 1) Normal left ventricular

systolic function with the EF of 62%; 2) No evidence of right atrial mass; 3) Top normal

pulmonary artery systolic pressure at 31 mm Hg. (Tr. 253).

On April 10, 2008, Dr. Pally completed an Exercise Tolerance Test Report of Plaintiff.

(Tr. 257).  Dr. Pally noted that Plaintiff was a 52-year-old female with status post pulmonary

embolectomy and arteriosclerotic heart disease. (Tr. 257).  Plaintiff's resting EKG showed

normal sinus rhythm and poor R wave progression in the anterior leads. (Tr. 257).  Plaintiff was

exercised on a treadmill utilizing standard Bruce protocol to the heart rate of 146 bpm, which is

92% of age predicted maximum heart rate and total time of exercise was 7 minutes 30 seconds

terminated because of fatigue. (Tr. 257).  The total METS Plaintiff achieved was 10 and a max

VO2 of 35 with no EKG changes, suggesting myocardial ischemia. (Tr. 257).  Dr. Pally found

the recorded the following impression: "1) Functional Class I with achievement of submaximal

heart rate with no electrocardiographic or symptomatic evidence of myocardial ischemia; 2) This

is a normal myocardial perfusion scan with no evidence of myocardial ischemia or infarction. There is normal EF of 70% with normal wall motion and thickening." (Tr. 258).

On May 11, 2008, Dr. Pally completed a 2-D Echocardiographic Report of Plaintiff. (Tr. 251). Dr. Pally recorded the following impression: 1) Normal left ventricular systolic function with EF at 60%; 2) Mitral valve prolapse, mild; 3) No evidence of thrombus in the right atrium; 4) Aortic regurgitation, trace to mild; 5) Non-classic mitral valve prolapse. (Tr. 251).

On August 11, 2008, and February 9, 2009, Plaintiff presented to Brian Martin, D.O., for follow-up examinations. (Tr. 294, 296). Dr. Martin noted after both visits that Plaintiff had no chest pain, shortness of breath or fatigue. (Tr. 296). Dr. Martin noted that Plaintiff complained of some red spots coming up all over her body during her August 11 visit and noted that Plaintiff complained of nasal congestion during her February 9 visit. (Tr. 294, 296).

On May 5, 2009 Dr. Pally completed a 2-D Echocardiographic Report of Plaintiff. (Tr. 249). Dr. Pally noted that Plaintiff was a 54-year-old female with coronary embolism with right atrial mass status post thrombus removed from the right atrium. (Tr. 249). Dr. Pally found that Plaintiff's left ventricular cavity size was normal with the EF of 55%-60, that the atrial annulus is normal in morphology and functioning except from trace to mild mitral regurgitation and diastolic relaxation abnormality with elevated E to A ratio on the transmittal flow, that three was no evidence of mass in Plaintiff's right atrium, that the interventricular and interatrial septa was intact, and that aortic root dimension was within normal limits. (Tr. 249).

On August 11, 2009, Plaintiff presented to Dr. Martin for a follow-up visit. (Tr. 289). Dr. Martin noted that Plaintiff was having anxiety issues which were interfering with her normal daily activities. (Tr. 289). Dr. Martin noted that Plaintiff had gained weight and was showing an increase in tension. (Tr. 289).

On September 1, 2009, Plaintiff presented to Dr. Marin for a follow up. (Tr. 287).  Dr. Martin noted that Plaintiff's anxiety was only slightly better and that Plaintiff was having mood swings. (Tr. 287).  Dr. Martin noted that Plaintiff's husband, who was present at the follow-up, commented that Plaintiff's anxiety has been going on since her heart surgery a few years earlier and that Plaintiff was unable to get out on her own anymore or function in any social situation. (Tr. 287).  Dr. Martin prescribed Effexor and recommended that Plaintiff look into counseling and/or therapy as well. (Tr. 288).

On October 1, 2009, Plaintiff presented to Dr. Martin for a follow-up. (Tr. 285).  Dr. Martin noted that Plaintiff was doing better on the Effexor XR and tolerating it well. (Tr. 285).  Dr. Martin noted that Plaintiff was less anxious, more social, and that she had no other problems or complaints. (Tr. 285).  Dr. Martin assessed that Plaintiff's anxiety had improved and did not change her medication. (Tr. 286).

On December 2, 2009, Plaintiff presented to the Center for Psychology in Fort Myers, Florida. (Tr. 266-269).  Dr. Candice Hurst noted that Plaintiff was having mood swings in which she experienced fearfulness. (Tr. 266).  Plaintiff explained that it had happened once while she was shopping and another time while she was at a party. (Tr. 266).  Dr. Hurst noted that Plaintiff described her episodes as having occurred twenty times, first beginning on her vacation in May of 2009. (Tr. 266).  Plaintiff explained that her worries or anxieties did not cause her panic. Plaintiff's symptoms are that she sweats, her blood pressure rises as if she were running, and she experiences irregular heartbeat. (Tr. 266).  Dr. Hurst diagnosed Plaintiff with anxiety disorder and recommended that Plaintiff have weekly individual psychotherapy. (Tr. 268).

On January 21, 2010, Plaintiff presented to Dr. Martin for a follow-up. (Tr. 283).  Dr. Martin noted that Plaintiff was feeling well and that the Effexor XR was controlling her anxiety

effectively. (Tr. 283).  Dr. Martin noted that Plaintiff had no palpitations or chest pain. (Tr. 283).

Dr. Martin assessed that Plaintiff's anxiety remained stable.  Dr. Martin did not change

Plaintiff's medication. (Tr. 284).

On February 1, 2010, Plaintiff presented to Dr. Martin complaining of left side pain

radiating into her back. (Tr. 280).  Dr. Martin noted that Plaintiff felt achy and could not find a

comfortable position. (Tr. 280).  Dr. Martin noted that Plaintiff did not have any increased

nervousness, mood changes or depression. (Tr. 280).  Dr. Martin assessed that Plaintiff's pain

was likely caused by renal colic and prescribed Cipro and Vicodin. (Tr. 281).  Dr. Martin ordered

a renal ultrasound. (Tr. 282).  No kidney stones were found. (Tr. 278).

On February 8, 2010, Plaintiff presented to Dr. Martin complaining of a rash on her left

flank in the area where she had experienced pain the week before. (Tr. 272).  Dr. Martin noted

that the rash was spreading to Plaintiff's front and that it was very painful at times. (Tr. 272).

Cortisone cream did not provide relief. (Tr. 272).  Dr. Martin noted that Plaintiff's anxiety had

not increased and that she was coping well. (Tr. 272). Dr. Martin assessed Plaintiff with herpes

zoster and prescribed Valtrex and Medrol. (Tr. 273).  On February 15, 2010, Plaintiff presented

to Dr. Martin for a follow-up regarding her left side abdominal rash. (Tr. 270).  Plaintiff reported

her pain as being about 50% better and that she had no other complaints or problems. (Tr. 270).

On April 22, 2010, and October 4, 2010, Plaintiff presented to Dr. Pally for follow up

visits. (Tr. 340, 344).  Dr. Pally noted that Plaintiff had no chest pain, dyspnea, or edema. (Tr.

340, 344).

On July 27, 2010, Plaintiff presented to Dr. Martin for a six month follow-up. (Tr. 352).

Dr. Martin noted that Plaintiff complained of increased sweating. (Tr. 352).  Dr. Martin reviewed

the Plaintiff's labs from February and noted that she was euthyroid at that time. (Tr. 352).  Dr.

-12-

Martin found that Plaintiff's anxiety was stable on the Effexor and that Effexor was likely the cause of her sweating. (Tr. 352).  Dr. Martin noted that Plaintiff's lipids were at goal and directed Plaintiff to return for a follow-up in six months. (Tr. 352-353).

On January 27, 2011, Plaintiff presented to Dr. Martin for a follow-up. (Tr. 349).  Dr. Martin noted that Plaintiff had recently had a urinary tract infection but that she was 90% better after taking a Zpack. (Tr. 349).  Dr. Martin noted that Plaintiff complained of continued anxiety issues despite the Effexor, but said that the Effexor helps. (Tr. 349).

On May 25, 2011, Dr. Martin, performed a Physical Capacity Evaluation of Plaintiff. (Tr. 355-356).  Dr. Martin found that Plaintiff, in an 8 hour work day, can stand/walk for 1 hour at one time, and can stand/walk for 3 hours total. (Tr. 355).  Dr. Martin found that Plaintiff, in an 8 hour work day, can sit for 1 hour at one time, and for three hours total throughout the day. (Tr. 355).  Dr. Martin found that Plaintiff can occasionally lift up to 10 pounds. (Tr. 355).  Dr. Martin found that Plaintiff can use her hand for repetitive simple grasping, pushing and pulling, and fine manipulation. (Tr. 355).  Dr. Martin found that Plaintiff can use her feet for repetitive movements as in operating foot controls.  Dr. Martin found that Plaintiff can occasionally bend, squat, crawl, and climb, and is able to reach above her shoulders. (Tr. 356).

On June 2, 2011, and June 14, 2011, Plaintiff presented to Dr. Pally for scheduled follow-ups. (Tr. 375-381).  At both follow-ups, Dr. Pally noted that Plaintiff was not experiencing chest pain or dyspnea. (Tr. 375, 378).  Dr. Pally noted that Plaintiff still has palpitations once in a while but that she is stable. (Tr. 380).  Dr. Pally further noted that Plaintiff has stress at work and that her EKG was normal. (Tr. 377).

### C. State Agency Evaluations

On March 18, 2010, Shirley Strickland[4] performed a Case Analysis of Plaintiff's file. (Tr. 313).  Ms. Strickland found that although there was medical evidence, it was not information sufficient to determine disability, if any, before Plaintiff's date last insured. (Tr. 313).

On March 22, 2010, Robin M. Johnson, Psy.D., completed a Psychiatric Review Technique of Plaintiff. (Tr. 299-312).  Dr. Johnson found that there was insufficient evidence in Plaintiff's record "to adjudicate for DLI[5] of 12/31/2008." (Tr. 311).

On June 28, 2010, Oscar Ruiz, M.D., performed a Physical Residual Capacity Assessment of Plaintiff. (Tr. 314-321).  Dr. Ruiz found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of about 6 hours in an 8-hour workday, and push and/or pull without limit, other than as shown for lift and/or carry. (Tr. 315).  Dr. Ruiz noted that Plaintiff's medical evidence indicates that she has a history of blood clot formation in the right atrium possibly secondary to administration of hormones to control menopausal symptoms. (Tr. 315).  Dr. Ruiz noted that Plaintiff has a history of pulmonary embolism and surgical removal of the clot in the right atrium.  Dr. Ruiz Plaintiff's visit to Dr. Pally on October 2, 2006, which indicated that an echo had been performed and that there was no evidence of clot in Plaintiff's right atrium.  (Tr. 315).  Dr. Ruiz noted that Plaintiff's office visits reveal that she was not having any chest pain, dyspnea or edema and that her physical examinations were unremarkable. (Tr. 315-316).  Dr. Ruiz found that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 316-318).  Dr. Ruiz concluded that Plaintiff's symptoms were attributable to her medically determination

---

[4] The record does not provide Ms. Strickland's credentials.
[5] The Court understands DLI to mean date last insured.

impairments and that the severity and duration of the symptoms was consistent with the total medical evidence. (Tr. 319).

On July 1, 2010, Alan Harris, Ph.D., completed a Psychiatric Review Technique of Plaintiff. (Tr. 322-335). Dr. Harris found that there was insufficient evidence in Plaintiff's record to complete the form. (Tr. 322).

**E. Hearing Testimony**

A hearing was held before the ALJ on July 28, 2011. (Tr. 31-40). Plaintiff testified as follows. She testified that she was five feet tall and weighed 137 pounds. (Tr. 33). Plaintiff testified that she had gained some weight over the last couple of years from stress and overeating. (Tr. 33). Plaintiff testified that her stress and anxiety cause her to have shingles, which are very painful. (Tr. 33). She testified that she first started getting the shingles about a year before the hearing and that they had lasted two months. (Tr. 33-24). Plaintiff stated that she has panic attacks which are caused by stressful situations, and that she tries to avoid being around other people. (Tr. 34). Plaintiff testified that she avoids driving unless she has to. (Tr. 34). Plaintiff testified that she cannot sit or stand very long because her legs cramp. (Tr. 35). Plaintiff testified that she is susceptible to blood clotting and cannot sit for more than two hours because she could get a blood clot from doing so. (Tr. 35). Plaintiff testified that she had taken the blood thinning medication, Coumadin, for a year but that she was no longer taking it at the time of the hearing. (Tr. 35). Plaintiff testified that her doctor told her to be careful once she quit taking Coumadin and to not go into hot water or spend too much time in the sun. (Tr. 36).

Plaintiff testified that she had a pulmonary embolism in 2005. (Tr. 36). Plaintiff testified that she had open heart surgery to treat her pulmonary embolism and that the surgery left her with an irregular heartbeat. (Tr. 36). Plaintiff testified that her chest does not hurt. (Tr. 37). She

-15-

testified that her breath starts getting shorter every time that she begins to get nervous and that she breathes irregularly when this happens. (Tr. 37).

Plaintiff testified that she has allergies which cause her eyes to tear up. (Tr. 37). She testified that she takes medication for her allergies which have the side effect of making her very sleepy and tired. (Tr. 38). Plaintiff testified that she takes naps during the day four to five times a week if she is home, but will skip her nap if she has an appointment or is not home. (Tr. 38).

Plaintiff testified that she has problems concentrating and staying focused when she is nervous. (Tr. 38). Plaintiff testified that when she is nervous she will do things such as forget her phone or even her name. (Tr. 38). Plaintiff testified that she has problems sleeping at night and is still tired in the morning due to her lack of sleep. (Tr. 38-39). Plaintiff testified that she is limited in her ability to cook, do laundry, and clean, and that she will do whatever she can. (Tr. 39). Plaintiff testified that there are days when she doesn't do anything at all. (Tr. 39). Plaintiff testified that three to four times a week her anxiety causes her to be unable to do anything. (Tr. 39). Plaintiff testified that on days where her anxiety prevents her from doing anything that it takes five to six hours to get her breathing to go back to normal. (Tr. 39-40). Plaintiff stated that she avoids lifting and carrying things. (Tr. 40). Plaintiff testified that she has a fear of walking distances because her hearts starts racing. (Tr. 40).

## II.    Specific Issues and Conclusions of Law

Plaintiff raises three issues on appeal: (1) whether the ALJ erred by failing to elicit vocational expert testimony in light of his own findings that the Plaintiff is "moderately" limited in her ability to concentrate, persist, and keep pace; (2) whether the ALJ erred by failing to analyze whether, as of the date last insured, the Plaintiff is more appropriately considered an individual of "advanced age" using the non-mechanical application of the Grid age categories

under 20 CFR 404.1563(b); and (3) whether the ALJ failed to give proper weight to the RFC opinion of treating physician, Dr. Brian Martin.

> **1) Whether the ALJ erred by failing to elicit vocational expert testimony in light of his own findings that Plaintiff is "moderately" limited in her ability to concentrate, persist, and keep pace**

Plaintiff argues that the ALJ erred by failing to elicit vocational expert testimony. (Doc. 13 p. 6).  Citing *Phillips v. Barnhart,* 357 F.3d 1242 (11th Cir. 2004), Plaintiff argues that the ALJ was required to consult a vocational expert because the ALJ found that Plaintiff had non-exertional limitations that which negatively impact her ability to perform her past relevant work and which negatively impact the occupational base in the national economy. (Doc. 13 p. 6-7). Plaintiff contends that the ALJ substituted his own opinion for that of a vocational expert without justification when he determined that Plaintiff could perform her past relevant work. (Doc. 13 p. 10).  Plaintiff argues that the ALJ should have consulted with a vocational expert to accurately define Plaintiff's past job in accordance with the Dictionary of Occupational Titles and to determine whether Plaintiff could perform her past job given the residual functional capacity he assessed. (Doc. 13 p. 10).

Defendant argues that substantial evidence supports the ALJ's decision that Plaintiff could perform her past relevant work as a sales associate-stocker as she actually performed it. (Doc. 14 p. 10).  Further, Defendant argues that the ALJ did not err by not eliciting testimony from a vocational expert.  Defendant contends that Plaintiff's reliance on *Phillips* is unavailing because the court in *Phillips* addressed when an ALJ is required to consult a vocational expert under step five in the sequential analysis. (Doc. 14 p. 10).  Here, Defendant argues, the ALJ found at step four that Plaintiff was capable of performing her past relevant work and, thus, the ALJ's findings at step five were in the alternative. (Doc. 14 p. 10).

At step four in the five-step sequential evaluation, an ALJ will consider the claimant's RFC and compare it with the physical and mental demands of her past relevant work. 20 C.F.R. § 1520(a)(4)(iv), 20 C.F.R. § 1520(f).  If the claimant can still perform her past relevant work, then she will not be found disabled. *Id.*  Plaintiff bears the burden at step four of proving that she is unable to perform her past relevant work. *See Doughty v. Apfel,* 245 F.3d 1274, 1278-79 & n. 2 (11th Cir. 2001).

Here, the ALJ properly found that Plaintiff was capable of performing her past relevant work as a sales associate/stocker.  The ALJ compared Plaintiff's RFC with the physical and mental demands of her past relevant work and found that Plaintiff could perform such work as it is generally performed. (Tr. 22).  Citing to a Work History Report (Form SSA-3369) completed by Plaintiff, the ALJ noted that Plaintiff's description of her past relevant work indicates that she can perform such work at a light level of exertion. (Tr. 22).  The ALJ noted Plaintiff's previous work required no technical knowledge or skills, and that her RFC did not preclude her from performing the job's requirement of lifting 5-10 pounds frequently. (Tr. 22).  The ALJ concluded that Plaintiff was capable of performing her past relevant work as she described it.  Despite Plaintiff's contention, the ALJ did not err by failing to elicit vocational expert testimony at step four.  When an ALJ concludes that a claimant can perform her past relevant work, vocational expert testimony is not necessary. *Bliss v. Comm'r of Soc. Sec. Admin.,* 254 Fed.App'x 757, 758 (11th Cir. 2007) (citing *Lucas v. Sullivan,* 918 F.2d 1567, 1573 n.2 (11th Cir. 1990).  Testimony from a vocational expert is relevant at the fifth step of the evaluation process, when the burden is on the ALJ to show that jobs exist in the national economy that the claimant can perform. *Id.* (citing *Wilson v. Barnhart,* 284 F.3d 1219, 1227 (11th Cir. 2002).

For these reasons, the Court finds that the ALJ did not err at step four by failing to elicit testimony from a vocational expert before determining that Plaintiff could perform her past relevant work.

**2) Whether the ALJ erred by failing to analyze whether, as of the date last insured, the Plaintiff is more appropriately considered an individual of "advanced age" using the non-mechanical application of the Grid age categories under 20 C.F.R. § 404.1563(b)**

Plaintiff argues that the ALJ did not properly consider whether the Plaintiff qualified as an individual of "advanced age" at the time of her date last insured. (Doc. 13 p. 11). According to Plaintiff, if use of an older age category would result in a determination of "disability," the regulations require that the age categories not be mechanically applied, but that all factors be considered for their overall impact regarding the more appropriate age categorization. (Doc. 13 p. 11). Defendant argues that any error by the ALJ at step five is harmless because he properly found Plaintiff not disabled at step four. (Doc. 14 p. 10).

In this case, as discussed above, the ALJ found at step four that Plaintiff was capable of performing her past relevant work. Nevertheless, the ALJ proceeded to step five and found in the alternative that there was a significant number of jobs that Plaintiff could perform in the national economy. (Tr. 22). As part of his step five analysis, the ALJ considered whether Plaintiff should be categorized in a higher grid category and ultimately concluded that she should not. As the Court has determined that the ALJ's findings at step four were supported by substantial evidence, any error in the ALJ's analysis at step five will be harmless. Thus, the Court will not even consider the issue of whether the ALJ erred in his alternative step five analysis because any such error will be harmless in light of the ALJ's step four finding.

-19-

### 3) Whether the ALJ failed to give proper weight to the RFC opinion of treating physician, Dr. Brian Martin

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to give proper weight to the opinion of Plaintiff's treating physician, Dr. Brian Martin. (Doc. 13 p. 15).  Plaintiff argues that Dr. Martin's assessment of Plaintiff's RFC amounts to a finding that Plaintiff is incapable of work at even a sedentary exertional level and that the ALJ did not show good cause for his decision not to follow Dr. Martin's opinion.  Defendant argues that the ALJ gave good reasons for assigning little weight to the physical restrictions opined by Dr. Martin. (Doc. 14 p. 8).

"Weighing the opinions and findings of treating, examining, and non-examining physicians is an important part of steps four and five of the disability determination process." *Rosario v. Comm'r of Soc. Sec.,* 490 Fed.App'x 192, 194 (11th Cir. 2012).  Absent "good cause," an ALJ must give the medical opinions of treating physicians "substantial or considerable weight." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1179 (11th Cir. 2011) (citing *Lewis v. Callahan,* 125 F.3d 1436, 1439 (11th Cir. 1997)).  The Eleventh Circuit has concluded that good cause exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1240-41. An ALJ may disregard a treating physician's opinion with good cause so long as he clearly articulates his reasons for doing so. *Winschel,* 631 F.3d at 1179.

In his opinion, the ALJ specifically considered Dr. Martin's opinion as to Plaintiff's RFC and gave it little weight. (Tr. 22).  The ALJ explained that his decision to accord Dr. Martin's "checkmark" Physical Capacity Evaluation form little weight was based on two reasons. (Tr. 22). First, the ALJ noted that Dr. Martin did not provide any narrative statement or recitation of

findings under a section reserved for "remarks," but rather left this section blank. (Tr. 22).

Further, and according to the ALJ, more importantly, Dr. Martin's treatment notes do not

supported the alleged limitations Dr. Martin opined that Plaintiff had. (Tr. 22).  The ALJ noted

that Dr. Martin had found as of August 11, 2008, that Plaintiff had a resolved embolism and

thrombosis problems.  The ALJ noted Dr. Martin's findings that Plaintiff had no chest pain,

shortness of breath or fatigue and that Plaintiff had normal activity and energy levels.  The ALJ

concluded that "Dr. Martin's own treatment notes from 2008 fail to support his opinion of severe

limitation as on functional activity since April of 2005." (Tr. 22).   The ALJ clearly articulated

his reasons for giving Dr. Martin's opinion of Plaintiff's RFC little weight, and thus, the Court

finds that he did not err in this regard.

## IV.   Conclusion

The Court finds that the ALJ's decision is consistent with the requirements of the law and

is supported by substantial evidence.  Therefore,

**IT IS RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be

**AFFIRMED.**

In Chambers, Fort Myers, Florida, this 11th day of February, 2014.

*[signature]*

DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations in this
report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within fourteen (14) days of the
date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of
issues covered in the report, and shall bar an aggrieved party from attacking the factual findings
on appeal.

The Court Requests that the Clerk of Court Mail or Deliver Copies of this Order to All Parties and All Counsel of Record